## RINK'S APPEAL.

A Court of Equity will not enjoin a man who receives a certificate of election from acting under it, even though it appears that a mistake has occurred in counting up the votes, which, if corrected, shows he was not elected.

Appeal from Common Pleas, No. 3 of Philadelphia County. In Equity. No. 343 January Term, 1880.

The opinion of the Court below contains the facts of the case, and was delivered March 18, 1880, per

FINLETTER, J.:

The complaint avers that in the computation of votes for Magistrate sixty votes were erroneously counted for Robert J. Barr, which, if corrected, would change the result and elect the complainant by forty-five votes.

He further avers "That the said error occurred in the following manner:—The officers and sworn assistants of the judges in computing said returns set down in the general return of votes for Robert J. Barr in the fourth division of the Twenty-fourth ward as seventy-four, and carried the same into the total computation of the votes received for said Barr in said ward. Whereas the return sheet, the triplicate return sheet, the tally list, and the return of votes, being all the papers showing the result filed by the judges of said division in the office of the Prothonotary of the Court of Common Pleas on the day after the election, all agree in showing that the said Robert J. Barr had received only fourteen votes in said division for Magistrate aforesaid. That the said error occurred through a clerical error made by the officers and sworn assistants of the judges, who were designated to compute and certify said return."

The relief prayed for is that Barr shall be specially enjoined from acting upon the certificate issued to him; or under the commission, if issued by the Governor. And further that the Recorder shall be restrained from recording the commission, and that the Mayor shall be directed to recall the certificate from the Governor.

An inspection of the election papers submitted to us shows how the mistake occurred. The vote was correctly announced

3 Wa 22

by the officers and correctly written down by the recording clerks. The change was effected in the passage of the sheets from them to the computing clerks. This is evident from the fact that the total vote has not been changed. From the nature of their employment it could not have been done by the recording clerks whilst they were engaged in that particular duty. It must have been done whilst the papers were in the possession of the computing clerks, or in their transmission from them to the recording clerks.

The well-known and well-tried integrity of our officers and the clerks prevents us from harboring the faintest suspicion that they made the alterations. All alterations are made by the direct order of the judges upon proof is allowed. It would be as much a violation of his duty for a clerk to correct a mistake without the direction of the judges, as it would be to make a false entry or falsify a true one.

It is not therefore a mistake of the judges or their assistants as is alleged by the bill upon which we are called to act. It is a forgery and nothing else ; and made by some one not connected with the computation or recording.

It is proper here to say that the utmost care on the part of the judges and their officers could not have prevented or detected the fraud. It would have required but a moment's time to effect it, and when done detection became impossible without a long and minute examination of all the election returns and papers. At the same time it is the most dangerous of election frauds. The candidates and those interested hear the vote of a division announced correctly with the judges examing and following the call of the officers, and are thereby led to suppose that everything is fair, and dismiss the matter from their minds. If such a fraud occurs afterwards, it is very likely to become a success, because few persons have the time and skill to find it amid the mass of election papers, with nothing to indicate that it exists.

It is important that the exact character of this fraud should be understood. It is infinitely of greater moment that our election returns should have the fullest confidence than that any particular person should exercise an office.

The legislature has thought proper to impose upon the judiciary the duties of election officers, giving to them the authority to appoint assistants, who shall be sworn to perform their duty with fidelity. Whilst these duties may not be regarded as judicial in the general and technical sense of the term, and may be irksome and laborious, because so entirely different from their ordinary duties, the judges have always endeavored to give them their closest and best attention, recognizing no higher duty of any citizen than to assist in ascertaining the will of the people expressed by the ballot.

We may here be allowed to say that in the many years they have had charge of this important business, no mistake attributable to them or their officers and assistants has occurred. Universal confidence has been restored to general returns of election, and thus indirectly the great franchise has been honored and protected.

Conceding that this is a fraud and of the worst character, two questions arise upon this application, viz. :

1. Have we, as a Court of Equity, jurisdiction ?

2. Should we exercise it by special injunction ?

It may be conceded as a general principle that whenever a wrong is done or a right invaded, a Court of Equity may intervene to restrain the wrong-doer or protect the injured, if there be no other remedy. Originally arising to give the special justice which the law was unable to award, its powers, although very much enlarged, are still limited, and must be found either in special legislation or in the decisions of our Courts of last resort.

The complainant has relied solely upon Miller vs. Lowry, 5 Phila., 205, as conclusive of our authority. The case does not seem to have been fully argued, and the Court has simply affirmed its jurisdiction as follows :—"Thompson, P. J., held that the question here was whether the Court had the right to prevent the use of a fraudulent paper, and that the power of Courts of Equity to restrain parties from the use of false papers in derogation of the rights of others had never been doubted. It was alleged in the bill that the certificate of Mr.

Lowry was a false and fraudulent one, and that he was about to use it. If this was so the Court had the right to restrain him."

We have always regarded Judge Thompson as high authority in equity proceedings, and are inclined to accept his rulings, although not fortified by his reasoning. What then was Miller vs. Lowry? An established conspiracy between some of the election officers and the clerks of Council to use a fraudulent certificate to the injury of the holder of a legal one who had been declared duly elected. Here was a wrong which not only deprived a suitor of his right, but indirectly affected the rights of the whole community. It needed little more to enable a majority of the city government to perpetuate itself and thus usurp the powers of government. To meet such exigencies a Court of Equity alone was adequate; and there was no other remedy.

If, after all the judges had computed the vote and issued a certificate to the person duly elected, [any of them had conspired with the Mayor and Governor to use a fraudulent certificate, and thereby give the commission to one not elected, Miller vs. Lowry would have been conclusive.

No such case is presented to us. Here the certificate is legal; the use of it by Mr. Barr and the Mayor and the Governor is not in conflict with any other certificate or ascertained right. And if a wrong has been done or a right interfered with, ample redress is by law provided.

Even if we might assume jurisdiction, there is perhaps sufficient warrant for us to refuse the prayer of the bill. Whilst it prays us to correct a wrong, it does not ask us to enforce any right of the complainant. We are requested to restrain a false certificate, but we are not required to issue a legal certificate to any one else. This has not been done because we have no authority in any event to grant such a prayer.

In controversies between individuals in civil matters, Courts do not sit merely to ascertain a wrong and suppress it. If no individual right can be vindicated or protected, the use of the Court can not be successfully invoked by a suitor; and especially is this so if he has a tribunal with full power to give

him adequate relief. If we are wrong in this, still the fact that we cannot, in this proceeding, aid the complainant in his effort to obtain a commission, would prevent us from exer- cising the strongest power of the Court upon a preliminary hearing.

When the jurisdiction of a Court of Equity attaches, it has control of the whole subject-matter, and all its incidents. It would not be enough to inquire into this single allegation of mistakes and to pass judgment upon it. The *certificate* embraces all the divisions, and we cannot inquire into the total vote upon which it is founded, without examining all the component parts of that total. This necessarily involves an examination of all the returns. Nay, more, as the several returns are the aggregates of individual votes, we might be called upon to pass upon the legality of those votes. And thus the application would open up an indefinite field of inquiry. Whilst this might not warrant us in refusing to entertain the complaint, it is a very good reason why we should not interfere by special injunction when we are not asked to protect or enforce any right of the plaintiff.

Again, although we have no power to restrain the Governor from issuing a commission, we have been asked to restrain Mr. Barr from acting under that commission. But have we the right to restrain the exercise of a franchise under a law- fully issued commission? The question must give us a pause and stand as a barrier to the prayer of the complainant.

It will be seen that we are in fact called upon to enter upon a contested election case with all its details. Courts of Equity in the investigation of frauds exercise the widest latitude in the admission of testimony. That which may have the remotest bearing upon the question can not be excluded. This and perhaps many other peculiarities of a Court of Equity, would make it the most unsatisfactory tribunal in which to try a contested election. Whilst even this should not appall us if our jurisdiction was undoubted, it ought to make us hesitate, and restrain us from exercising our extraordinary functions.

We do not find authority in our general powers to grant

the prayer of the complainant. It has not been conferred upon us by the legislature and we have been shown no precedent which authorizes us to act in this particular case, or in an election case, or in any case in which a remedy is not sought to enforce a right.

But if this were otherwise we do not see that upon an *ex–parte* hearing for a special injunction we should be called upon to go through all the minutiæ of a contested election. We can not grant a special injunction unless upon the clearest case, and to prevent an irreparable injury. Such an injury can not be where the plaintiff does not ask for, and we cannot grant relief upon final hearing. Even if we restrain Mr. Barr we can not give the office to complainant. When we have exhausted our authority there would still stand between him and the magistracy a contested election. He would take nothing but continued litigation from success now, and such considerations are sufficient to prevent the exercise of our special authority.

A better reason for our non-interference arises from the fact that we think the judges who issued the certificate have control over it until the Governor has issued the commission. The power to compute and certify the vote certainly includes the right to correct errors and frauds which may occur in the performance of that duty. The certificate is not only their act, but until the commission issues it is their continuous act. The commission is the sequence of the single duty to compute and certify properly. As the case appears to us, a fraud has been perpetrated, not only upon Mr. Rink, and the whole body of voters, but upon the judges themselves in the discharge of this duty. They had the unquestioned right to correct it whilst acting ; and may it be said that the fraud shall be triumphant simply because so artfully contrived that it escaped detection until now. No other right has intervened and no public policy forbids the correction. They may under all the circumstances, and for proper reasons, refuse to act. This they have already done after a full consideration of the subject. But the existence of a tribunal to which the subject matter is specially assigned, and which could so easily reach

the wrong, is the best of all reasons for us to withhold our hands.

There is, however, a special tribunal for contested elections, exclusive of all others, to which the complainant has applied. The Acts of Assembly prescribe the Court and the procedure; and the Supreme Court has uniformly held that Courts of Equity have not jurisdiction.

Perhaps it would have been better to have rested our decision upon this alone. But it seemed to us that what we have said might find an excuse in the peculiarity of the case, and in the fact that it was so forcibly argued that this was not a case of contested election, but the correction of a palpable error or mistake. It was moreover contended that Miller vs. Lowry gave us authority. We can not agree with the complainant in either position. It is a contested election in the most aggravated form; and one which would be without results so far as he is concerned, even if he were successful; and we have not been able to find the slightest authority in the case cited.

But even if it be simply a mistake which we would be compelled to correct upon final hearing, why should we do it by special injunction? It should not be forgotten that it is a mistake imposed upon the president judge of this Court, and the president judges of two sister Courts, who may be invoked to act upon it, and who have power to give the relief prayed for if they believe the circumstances call upon them to act. We have no authority, and certainly no inclination, to interfere with their special duties. And whilst it may be, as was argued, that in the discharge of those duties they are merely clerks, we cannot divest ourselves of the idea that even when performing election duties they are still among the foremost of Pennsylvania judges in erudition, integrity, long service, and in the confidence of the people.

To entertain jurisdiction is to pass upon what they have done; to sit in judgment upon them. To issue a special injunction would be to hasten to do this unseemly thing, for no public good, and for no benefit to the complainant. Would it be wise to do this? It certainly would not strengthen the

faith of the community in the judiciary, whether acting in their judicial capacities or as election return clerks.

We have reached these conclusions after thoughtful consideration; and not without reluctance. Assuming the affidavits to be true, and they are not contradicted or explained, a great and dangerous fraud has been perpetrated upon dearest rights in the presence of the judges. The very means which they employed to correct mistakes and frauds, and guard against them, have been used not only for the purpose of fraud, but to conceal and make it successful.

The natural impulse of every honest man would be to lay the strong hand of the law upon the fraud, and turn its fruits to ashes. But we can not do this without violating every principle which governs its adminstration. It would be vengeance not justice. Even election frauds are temporary evils which find their surest and safest punishment in the due course of law. Wresting it from its orderly and serene course to punish a wrong-doer might give a general, but only a temporary satisfaction. It would, however, unsettle the faith of all in the immutable and eternal character of the law, and make it as variable and unstable as the passions of men. It cannot do a little wrong even for a great good. Before its rebuke all wrongs stand abashed ; and in its presence all rights are sacred. It is thus social order is preserved and the rights of person and property secured.

Special injunction refused.

---

Rink then appealed to the Supreme Court, complaining of the Court's refusal to grant the injunction.

*C. H. Jones and W. H. Ruddiman, Esqs.*, for appellant, cited Miller vs. Lowrey, 5 Phila., 202.

*C. F. Stilz, P. Duffy and T. F. Jenkins, Esqs.*, contra, argued that a contested election was Rink's only remedy, and cited Hulseman vs. Rems, 41 Pa., 396 ; Commonwealth vs. Baxter, 35 Pa., 263 ; Lawrence vs. Knight, 1 Brewster, 67 ; Ewing vs.

Thompson, 43 Pa., 372; Commonwealth vs. Garrigues, 28 Pa., 9.

The Supreme Court affirmed the decree of the Common Pleas on Feb. 13th, 1882, in the following opinion,

PER CURIAM:

This being an appeal from a decree refusing a preliminary injunction,

> Decree affirmed and appeal dismissed at the costs of the appellant.